55 CCPA

**Application of Oliver C. ECKEL.**
**Patent Appeal No. 7820.**

United States Court of Customs and Patent Appeals.

May 2, 1968.

disclosure, is not considered herein because it is not pertinent to the obviousness rejection.

Harold E. Cole, Boston, Mass., for appellant.

Joseph Schimmel, Washington, D. C. (Jere W. Sears, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and Judges RICH, SMITH, ALMOND, and KIRKPATRICK.*

ALMOND, Judge.

This is an appeal from the decision of the Board of Appeals affirming the rejection of the claims in appellant's application [1] on the ground of double patenting over the claims of appellant's patent,[2] despite the filing of a terminal disclaimer in the application.

To place the case in perspective with respect to the numerous other double patenting rejections appealed to this court of late, it is apparent from the letters of the examiner and decision of the board that they regard appellant to be claiming the same invention or a mere colorable variation thereof in his application claims as is defined by his patent claims. Appellant, on the other hand, is of the opinion that the description and claims of his patent are to a broad invention while the claims of his application are directed to a "specific structure" of a later invention not disclosed in the patent; and that, in view of a terminal disclaimer seasonably filed under 35 U.S. C. § 253, the board erred in failing to apply the decisions of this court in In re Robeson, 331 F.2d 610, 51 CCPA 1271; In re Kaye, 332 F.2d 816, 51 CCPA 1465; and In re Bowers, 359 F.2d 886, 53 CCPA 1590.

Eckel's own patent, No. 3,086,325, is the basis of the rejection. It is not prior art, having been copending with the application at bar. That patent discloses and claims assemblies of acoustical members to be attached to ceilings or walls. The members themselves are in the form of wedge-shaped elements of sound absorbing material mounted on supporting, track-engaging metal bases. The tracks are mounted in parallel positions on the walls and ceiling of a chamber to be acoustically treated, equally spaced apart, and the members can then be mounted thereon. Figures 5 and 6 of the patent drawings show the general idea.

---

* Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

1. Serial No. 211,606, filed July 23, 1962, for "Acoustical Members."

2. No. 3,086,325, issued April 23, 1963.

*Fig. 5*

*Fig. 6.*

In Fig. 5 portions of three tracks 15, 16, 17 are shown carried on supports 10 fastened to the wall W by screws 12. In Fig. 6, two acoustical members 40 are seen. The one on the right is turned 90° from the one on the left so that one member is seen in front and the other in side elevation. The double wedge-shaped members are made of wire mesh 44 filled with glass wool 42 or like material. The joiner members, or attaching metal base portions, are 29, having four sides 31 with inwardly-turned flanges 34a, 34b which engage track flanges 22. The patent drawings disclose all tracks as equally spaced and all acoustical units as

being of equal size and as being square. Being square, the acoustical units can be placed on the tracks in either of the positions shown in Fig. 6, i. e., rotated 90° from one another. The specification makes no mention of the shape of the units, and the word "square" does not appear in the patent. Certain claims, however, designate the joiner members, but not the acoustical members, as being of "substantially rectangular shape."

It will be understood that these acoustical members are used to line a room to make it into a nonsound-reflecting chamber, presumably for acoustical laboratory use. All four walls and the ceiling may thus be sound-proofed. It is clear that as many tracks as necessary will be secured to the flat surfaces to be treated and that they will all be equally spaced. In the patent disclosure, which is only one printed page, there are no variations or modifications of the single type of unit described, although the disclosure contains a more-or-less standard broadening clause: "The nature of the invention is such as to render it susceptible to various changes and modifications, and therefore, I am not to be limited to the construction disclosed by the drawings nor to the particular parts described in the specification; but am entitled to all such changes therefrom as fall within the scope of my claims."

Approximately a year and a half after filing the application for the issued patent, and while his application therefor was still pending, Eckel filed the application at bar containing added disclosure and including a sheet of new drawings. It is stated to be an object of this application to provide acoustical tiles of *different* sizes. The applicant, having noted that a great many rooms were of dimensions not equally divisible by standard tile widths, conceived the idea of supplying tiles of fractional widths to fill in the space remaining at the edge of a wall after the maximum number of full tiles had been mounted. Since these tiles are mounted on tracks, his idea also involved mounting of the end tracks at a proper distance from the previously mounted track to accommodate the fractional width tiles.

Figures 5, 6 and 7 of the application illustrate this concept.

These figures are quite similar to the patent drawings, except that the left-hand track in Fig. 5 is spaced only two-thirds of the distance from the next nearest track as that track is from the next adjacent track. As shown in Fig. 6, this track spacing accommodates a tile 62 having a width two-thirds that of the standard tiles. Another embodiment is shown in Fig. 7, where a tile having only a one-third width is used. In other drawings of the application, various tiles

are disclosed being of standard width in one direction but of various fractional widths in the other.

Only two claims have been brought before us on this appeal, both reciting an assembly of acoustical members with a support therefor. Claim 4 is reproduced below:

4. An assembly of acoustical members comprising a support having three tracks spaced apart different distances whereby there are relatively narrow and wide spaces between them, each said track having two inwardly extending retainer flanges spaced laterally apart, two sound absorbing devices each embodying a joiner one of which is of substantially oblong shape and the other is of substantially square shape, each said joiner having four right-angled side portions and four connector flanges extending angularly inward from said side portions, any two of said connector flanges of said square-shape joiner that are oppositely disposed being of such size that they are receivable on, and overlapped by one each of the said retainer flanges of the two of said widely spaced tracks, and are slidable along said latter two retainer flanges, and two of said connector flanges of said oblong-shaped joiner that are opposite [sic] disposed being of such size that they are receivable on and overlapped by said retainer flanges of the two of said narrowly spaced tracks and are slidable along said latter two retainer flanges.

Appealed claim 5 is similar to claim 4 but is broader in that the narrower or "oblong-shaped" joiner need have but one pair of normally extending side portions and associated connector flanges.

These claims were rejected for double patenting over claim 8 of appellant's

patent. The patent claim is very similar in organization to the appealed claim 4 reproduced above. The patent claim is broader, however, in that it merely recites "three tracks spaced laterally apart" without requiring relatively narrow and wide spaces between them. Also, the patent claim does not require that the joiners be either oblong or square, but merely that they have "four right-angled side portions." The patent claim, therefore, completely dominates the appealed claims.[3]

At the time the examiner made his final rejection, no terminal disclaimer had been filed. The examiner therefore quite properly made an "obviousness-type" double patenting rejection. He stated:

Claims 1–5 are rejected on the ground of double patenting over applicant's patent No. 3,086,325, claims 1 and 2 over patent claim 4, claim 3 over patent claim 1 and claims 4 and 5 over patent claim 8 when considering the state of the art as seen in Woodbury.[4] Woodbury would render obvious making the recited rectangular acoustical members of patent claim 4 and the acoustical members of patent claim 1 of an oblong configuration. It is further considered obvious in view of Woodbury to make one of the two acoustical members recited in patent claim 8 with an oblong shape.

Appellant filed a terminal disclaimer and an appeal to the board at the same time. In his answer, the examiner considered the terminal disclaimer but felt that it should have no effect in this case:

Claims 1–5 are considered to be unpatentable on the ground of double patenting over appellant's Patent No.

---

3. It should be noted that patent claim 8 also contains the recitation "each said device embodying a sound absorbing member having a main body of sound absorbing material tapering in width toward the outside end, said body outside end of one said device extending at an angle to the body outside end of the other said device," which has no counterpart in the

appealed claims. However, appellant's attorney stated in oral argument that he considered this recitation to be immaterial. The solicitor agreed.

4. Patent 2,101,568, which shows porous fiber board blocks of either square or oblong shape for use in sound deadening construction.

3,086,325, instant claim 1 over patent claim 4, claim 2 over patent claim 5, claim 3 over patent claim 1 and claims 4 and 5 over patent claim 8 when considering the state of the art as seen in Woodbury. Claims 1–3 and claims 4 and 5 by their recitation of the limitation "oblong" are *merely colorable variations* of the invention set forth in the patent claims 4, 5, 1 and claim 8 respectively. In re Siu, 105 USPQ 428. Judicial Notice may be taken of the fact that square tiles and tiles having fractional widths thereof as well as tiles having multiple widths thereof are conventionally employed when covering most surfaces. A tile having a width which is some fraction of or a multiple of the width of a square tile is, of course, oblong in configuration. It is quite unlikely that the artisan could use the patented invention on a variety of surfaces without employing an oblong tile. Under these circumstances the formation of (1) the recited rectangular tiles of patent claims 4 and 5, (2) the acoustical members having no limitation as to their configuration in patent claim 1 and, (3) one of the two acoustical members set forth in patent claim 8, with an oblong shape constitutes *merely a colorable variation* of the same idea.

However, if, as was the case in In re Robeson [331 F.2d 610, 51 CCPA 1271] 141 USPQ [485] 486, the instant claims are considered to be directed to something more than a mere colorable variation of the patented invention, then the oblong tile variation is one which would be *obvious* to the artisan having ordinary skill in view of the state of the art as seen in Woodbury and as reflected in virtually any tiled surface one may have observed.

In accordance with the decisions of In re Robeson [331 F.2d 610, 51 CCPA 1271] 141 USPQ [485] 486 and In re Saul Kaye [332 F.2d 816, 51 CCPA 1465] 141 USPQ 829, appellant filed a terminal disclaimer executed February 23, 1965. The filing of the terminal disclaimer would appear to obviate any consideration of extension of monopoly against the instant claims if they reflect something more than a colorable variation of the patented device. It is the examiner's position, as indicated supra, that the instant claims do not reflect anything more than a *colorable variation* of the patented device.

However, it is not apparent that the instant case comes under the Robeson-Kaye doctrine. In the Memorandum submitted August 18, 1964 by the Superintendent, Patent Examining Corps to the Directors and Group Supervisors indicates that the Board of Appeals has established the following guideline: the Robeson-Kaye doctrine would not be extended to cover cases of the same inventor having two different species which are unpatentable over each other but patentable over the prior art where there were generic or overlapping claims in one or both cases.

The patented claims either recite the tiles as being "rectangular" or do not limit the configuration in any way, and are therefore, *generic* to all the instant claims. It would appear, in view of the guideline noted supra, that the filing of a terminal disclaimer does not relieve the instant claims of the holding of double patenting because applicant is not entitled to only generic claims in one case and species claims in a second case. It will be noted that the species of square tile was never specifically claimed in the patent as a distinct species. Consequently the patented claims are all generic to the two species, only one being specifically claimed in the present case. [Emphasis added.]

It is apparent that the examiner asserted two clear grounds for refusing to give effect to the terminal disclaimer. He was of the opinion that changing a square tile to an oblong one was a mere colorable variation and thus specifically excluded from the *Robeson* doctrine. He also felt that the claims of the patent

and those of the application had a genus-species relation and that a terminal disclaimer was ineffective in such a situation. The examiner's reference to the obviousness of oblong tiles appears to be mere surplusage.

The board arrived at the same two grounds as the examiner, and expounded its understanding of the standards to be used in double patenting cases where a terminal disclaimer has been filed. The board said:

From consideration of appellant's patent disclosure and claims and from consideration of the present disclosure and claims, it appears to us that the distinction as to using "oblong" units, as well as the distinction as to placing track elements in varied spacing, is no more than an outgrowth of the geometrical fact that room spaces to be covered by blocks or panels are seldom divisible into even multiples of the block or panel sizes. Even casual observation of acoustic tiled ceilings, paneled walls, or composition tiled floors renders it apparent that odd sized units are commonly needed to complete the coverage. The adjustment of furring strips or more sophisticated track anchor units to the spacing dictated by fractional sized finishing courses of such geometrical units does not appear to us to call upon the creative faculties of a worker in the art to such a degree as to warrant patent protection. Where comparison of such change to prior art is involved the patent statutes in 35 U.S.C. 103 give guidance that a patent can be refused when:

"* * * the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art. * * *"

Under double patenting practice the same tests have been applicable to decide what degree of novelty over what was previously claimed would support a second patent. Where the patents sought are to expire together and the second patent adds protection for a "colorable variation" of subject matter claimed in the first patent the In re Robeson, supra decision appears to dictate a somewhat lesser standard of inventive contribution as acceptable for the support of a second patent associated with a terminal disclaimer.

In the present factual situation, we are convinced that the measure of difference between the claimed subject matter in the patent and the appealed claims is so meager as to fail to meet even this standard of inventive contribution. To grant a second patent to expire with the first patent would still involve decision that persons skilled in the art would be taxed to an extent to arrive at the concept apart from appellant's teaching. While this inventive creation does not have to come up to the threshold defined by obviousness in 35 U.S.C. 103, it appears to us that it still requires more of a contribution on appellant's part than is present in this case.

Apart from the decision as to what a "colorable variation" may mean under the In re Robeson, supra decision the facts in this case are not such as to render that case controlling in that the claims of appellant's prior patent are clearly of a breadth to encompass the "oblong" blocks now recited in specific terms. Claim 8 of the patent as applied to appealed claims 4 and 5 is similarly so general as to encompass the placing of three rails in varied spacing and the association therewith of varied sound absorbing devices. Thus it appears that the purpose of affording coverage for a colorable variation of what was previously claimed discussed in the In re Robeson, supra case is not present in this case.

The development of the board's thoughts on the "colorable variation" subject appears to be as follows:

(1) Where comparison to prior art is involved, 35 U.S.C. § 103 sets forth an obviousness standard,

(2) under double patenting practice the same test is applicable; but

(3) when patents are sought to expire together, a lesser standard than obviousness is still required to be met, i. e., a "colorable variation";

(4) the invention in this case is even less than the "colorable variation" required to support a second patent in a terminal disclaimer case.

This line of reasoning appears to provide four categories into which inventions may fall: Unobvious, Obvious, Colorable Variation, and Same Invention. This reasoning also appears to equate "colorable variations" with extreme obviousness.

It was not the intention of this court in *Robeson* to create a fourth category of inventions having no basis in the statutes. There are only three categories of inventions implicit in 35 U.S.C. §§ 102 and 103, and there is neither justification nor need for a fourth. We used the term "mere colorable variations of the same idea" in *Robeson* to mean that the same invention was being claimed in different language, or that insubstantial and immaterial limitations were being added to or dropped from the claims. The keystone of the colorable variation concept was that *the same invention* was being claimed although not in precisely the same language. It is apparent from the record of this case that our language in *Robeson* was not sufficiently explicit on this point and that both the Patent Office and the bar have given broader interpretation to this phrase than was intended. The result has been that use of the phrase has more tended to obscure than to resolve the issues involved in terminal disclaimer cases. Since the resolution of these issues involves primarily a determination of whether the same invention is or is not being twice claimed, we consider that an analysis couched in terms of a "colorable variation" is unnecessary and undesirable.

The board, as well as the examiner, was troubled by the so-called "overlap" of the claims of the patent and those of the application. The term "overlap," as we understand the use of it in this record, is a broad but somewhat ill-defined concept which may include genus-species relationships, domination of one claim by another, and perhaps other situations where claims are not explicitly mutually exclusive. The examiner felt that there was a genus-species relation in this case. The board expressed its opinion that the patent claims "encompassed" the application claims, and in its decision on request for reconsideration explained its use of this term by stating:

> Appellant's view that the only objection to a second patent on insignificantly different subject matter is "extension of monopoly," misses the point in our decision wherein we point out that two patents are sought having claims covering the same subject matter. Should such patents be issued and come under separate ownership, infringers would be subject to possible separate suits.

■ At the time the board wrote its opinion, In re Braithwaite, 379 F.2d 594, 54 CCPA 1589, had not been decided. In that case we did not consider that the classification of claims as "generic" or "embracing" or "overlapping" was of any help in resolving the issues involved in terminal disclaimer cases. The employment of such tests, just as employment of the "colorable variation" language, seems to divert attention from the sole issue of importance in these double patenting-terminal disclaimer cases, i. e. whether the applicant is attempting to twice claim the same invention, or whether he is claiming different inventions.

■ The terminal disclaimer can have no effect where it is attempted to twice claim the same invention. In re Knohl, 386 F.2d 476, 55 CCPA ——. But a terminal disclaimer will overcome a double patenting rejection where the appealed claim is an obvious variant of a patent claim but not obvious in view of the prior art. In re Robeson, supra. And such use of the terminal disclaimer

is not prohibited by the mere fact that the claims are not mutually exclusive. In re Braithwaite, supra.

Prior to these decisions, an inventor who discovered an obvious improvement on or obvious modification of an invention on which he had already filed a patent application could obtain patent protection specific to his new invention only by filing a new patent application disclosing both his original and his new invention, and abandoning his first application. This procedure would result in disclosure to the public of his original invention being delayed, perhaps for several years.

The decisions in the above cases, however, give the inventor a second choice. He may allow his first application to issue, and claim his new invention in a separate application having a terminal disclaimer. By this procedure, the inventor can obtain no claims which he would not have been entitled to under the previous practice. The decisions have, therefore, in no way enlarged the scope of patent protection available to the inventor. However, they do have the salutary effect of making public the inventor's original disclosure at an earlier date than would have been the case under previous practice. While we have explored the possible detrimental effects of this practice, we have found the usual arguments on this point to be lacking in substance. In re Jentoft, 392 F.2d 633, 55 CCPA ——. We, therefore, feel that the use of terminal disclaimers in such cases results in a clear benefit to the public, but in no substantial offsetting detriment.

Turning to the present case, we find difficulty in distinguishing the situation here from that which was present in *Braithwaite*, supra. In that case, the applicant had obtained a patent for the production of alkyl lead compounds from an alkyl-containing Grignard reagent and an alkyl halide. The claims covered use of different as well as the same alkyls in the two compounds, and certain broadening language in the specification indicated that the use of different alkyls was in contemplation of the inventor. However, the specification contained no explicit directions for producing such compounds, or examples of such compounds. Therefore, when the inventor filed a new application containing specific directions of how to make such compounds, we held that this was not the same invention as that previously claimed, and gave effect to the terminal disclaimer.

The parallel facts in this case are that the appellant obtained a patent disclosing only square tiles but containing claims which cover tiles of any configuration. Some broadening language in the specification supports a construction of the claims which would include shapes other than square, but there is no explicit disclosure of such a shape. The application now before us discloses and claims such shapes, in association with properly spaced tracks. We see no more reason to deny effect to the terminal disclaimer here than we did in *Braithwaite*.

The effect of this holding, as that in *Braithwaite*, is that the inventor obtains no claims which he could not have had in a continuation-in-part application, yet his original invention was disclosed sooner and his patent term for both his original and his new invention will end sooner than would be the case if he had availed himself of the continuation-in-part procedure.

The decision of the Board of Appeals is, therefore, reversed.

Reversed.

WORLEY, C. J., dissents.